# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. JUSTIN LEE JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-cv-444-JHP |
| | ) | |
| 1. AARON HACKER, in his individual and official capacity; | ) ) | |
| 2. JAMES ZEIGLER, in his individual and official capacity; | ) ) | |
| 3. JENNIFER ARNOLD, in her individual and official capacity; | ) ) | |
| 4. CITY OF BEGGS, a municipal corporation, | ) | |
| 5. EDDY RICE, in his individual and official capacity , | ) ) | |
| 6. LINDA BEAVER, in her individual and official capacity | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

The Defendants, Jennifer Arnold and Linda Beaver, in their individual capacities, filed separate Motions for Summary Judgment. [Dkt. Nos. 76 & 77, respectively]. Plaintiff filed his Response to each, and the Defendants filed their Replies. For the reasons set forth below, the Defendants' Motions should be granted.

## I.  INTRODUCTION

### A.  Background

On May 9, 1995, a man named Justin Riley Jones pleaded guilty to unlawful possession of drug paraphernalia and unlawful possession of a controlled drug in Okmulgee County, Oklahoma. Along with a suspended jail sentence, Justin Riley Jones was assessed a fine by the Okmulgee County judge and ordered to pay said fines at a rate of $50 per month until paid in

full. At the time, records associated with Justin Riley Jones' felony filing, Okmulgee County case number CF-1995-0052, were in paper format in a file at the Okmulgee County Court Clerk's office. In 1997, the Okmulgee County Court Clerk's office, along with most of the county court clerk's offices in Oklahoma, installed and implemented a computer case filing program known as Kellpro. The implementation of Kellpro was at the instruction of the Oklahoma Office of the Supreme Court Administrator and was created specifically for use by Court Administrators in the state. Files older than 1997, including CF-1995-0052, began being input into the Kellpro system.

In approximately 2003 or 2004, the Office of the Supreme Court Administrator of Oklahoma required each Court Clerk to designate a deputy clerk as Cost Administrator. The Cost Administrator is responsible for, among other things, tracking payments and receipts for the collection of fines and court costs associated with the dockets of the Okmulgee County Clerk. Each Cost Administrator was provided training upon appointment through the Office of the Supreme Court Administrator, as well as on-the-job training by the outgoing Cost Administrator. In addition, all deputies received annual training on the Kellpro system by Kellpro administrators both in classes in Oklahoma City and at the Okmulgee County Court Clerk's Office.

**B. Okmulgee County Procedure for Issuing Bench Warrants**

Defendant Linda Beaver is the Court Clerk of Okmulgee County. She has held that position since 1994. It was the commonly understood practice that the Okmulgee County judges expect the Court Clerk's office, and specifically the Cost Administrator, to determine those criminal defendants who failed to pay court-ordered fines in criminal cases and to prepare bench warrants for the judges' signature for those persons. The Cost Administrator would perform an Accounts Receivable Report within the Kellpro system, and the system would "flag" defendants who were delinquent. The Cost Administrator would then print bench warrants for the criminal

defendant's arrest. However, the Kellpro system would automatically input whatever identifying information the system had on the defendant directly onto any warrant. The Court Administrator did not input the information manually. The printed warrants were then submitted to an appropriate Okmulgee County judge. Upon review of any failure-to-pay bench warrant submitted to the judge, the judge will sign the warrant for the person's arrest. This is a regular and ongoing occurrence in Okmulgee County which results in hundreds of warrants being prepared and signed per month. The Cost Administrator would take the signed warrants, file them of public record, scan them into the Kellpro system for the appropriate case, and either fax the warrants or have them hand delivered to the Sheriff's Office, depending on how voluminous the stack of warrants was for any particular day. The warrants, as well as the entire case file, are generally available to the public on www.odcr.com (On Demand Court Records). The website feeds off of the Kellpro system although the website itself is not maintained by the court clerks.

Defendant Arnold, who became the Cost Administrator in Okmulgee County in 2008, estimated she performed the above-described functions thousands of times per year during her tenure. Upon the system "flagging" a delinquent payer, she would review the case and ensure the delinquent payer was at least 10 days behind pursuant to the internal rule in Okmulgee County as she was trained. Arnold also implemented her own rule and would generally give a delinquent payer 30 to 60 days' grace period before she would print the warrant depending on the payment history of the criminal defendant. After performing the bench warrant procedure stated above as expected by the judges, Arnold would routinely send a Notice of Warrant letter to the criminal defendant to advise them of the warrant and that it would be recalled if they paid the court-ordered fine.

## C.  The Warrants In Question

In October 2008, Plaintiff, Justin <u>Lee</u> Jones, received a speeding ticket from the Oklahoma Highway Patrol in Okmulgee County.  Subsequently, Plaintiff's information, including his date of birth and mailing address, was entered into the Kellpro system.  Who, specifically, within the court clerk's office entered his information into the system is untraceable and unknown although there is no indication either Arnold or Beaver entered the information.  When Plaintiff paid his traffic ticket in 2008, an identifiable non-party deputy court clerk provided Plaintiff with a receipt.  The receipt of payment was given to Plaintiff, but apparently no one, including Plaintiff, noticed the receipt was made out to Justin <u>Riley</u> Jones instead of Justin <u>Lee</u> Jones.  This appears to be the first instance of transposing Justin Riley Jones with Justin Lee Jones in the Kellpro system.

On August 19, 2009, Arnold was performing her usual routine of running the Accounts Receivable Report.  Kellpro "flagged" Case No. CF-1995-0052, as Justin Riley Jones had paid nary a penny toward his fines ordered 14 years prior.  Accordingly, Arnold printed the warrant from the Kellpro system.  For reasons which are not specifically known to any party, Plaintiff's full name, mailing address, and date of birth (7/26/2981) were tied to Case No. CF-1995-0052 within the Kellpro system.  When Arnold printed the warrant, Plaintiff's information, instead of that of Justin <u>Riley</u> Jones, was automatically generated onto the face of the warrant.  When Arnold printed the warrant, along with the others on that day, she believed the information tied to the case was correct.  Per her usual procedure, Arnold wrote the amount due on the warrant and took it to Judge Cynthia Pickering for signature.  Judge Pickering signed an affidavit averring this was the typical procedure and what was expected from Arnold.  After Judge Pickering signed the arrest warrant, it was filed of public record on August 31, 2009, and sent to the

Okmulgee County Sheriff's Office.  Plaintiff does not dispute the Arnold believed the warrant was accurate at the time, although we know now it was not.

On September 11, 2009, Arnold sent a Notice of Warrant to Plaintiff at Plaintiff's mailing address listed in CF-1995-0052 in the Kellpro system.  Plaintiff's wife, Tammy Jones, opened the letter upon receipt, and called her husband to inquire whether he knew anything about it. Plaintiff told his wife he did not know what it was about, and he requested she call the Court Clerk's office to straighten it out because he was tied up with work.  Mrs. Jones called the court clerk's office within a few days.  Mrs. Jones did not ask for any specific person within the court clerk's office and spoke to whomever answered the phone.  Mrs. Jones does not know with whom she spoke, but she testified it was a short, cordial conversation, and the person on the other end of the line said it would be taken care of.  Mrs. Jones and Plaintiff essentially forgot about the Notice for three-and-a-half years.

Arnold denies ever speaking with Mrs. Jones, or anyone, about the erroneous 2009 warrant.  She submitted evidence that it was standard procedure for her to make notes within the Kellpro system if someone were to call in about any given case so she could remember conversations, what they entailed, and with whom she spoke.  There were no notes within the Kellpro system about any conversation which took place between Mrs. Jones and Arnold or anyone within the Court Clerk's office.  Furthermore, testimony indicates any deputy court clerk within the office could have answered the phone.

Nearly 3 years later, on May 4th, 2012, Arnold issued a second warrant for Case No. CF-1995-0052 because no moneys had been paid and the bond had increased.  The same process was used as described above; it was signed by an Okmulgee County judge, filed of public record, and sent to the Sheriff's Office.  Like the 2009 warrant, it was available on www.odcr.com because it

generates information from Kellpro. The May 2012 warrant looked similar to the 2009 warrant except the date of birth had apparently been changed within the Kellpro system to 3/07/1974, Justin <u>Riley</u> Jones' correct date of birth. Further, Plaintiff's address which was noted on the 2009 warrant was deleted, leaving no address at all. Because it was changed within the Kellpro system, it was automatically generated onto the new warrant when it was printed by Arnold. Arnold has no recollection of changing any information in CF-1995-0052, and testimony indicates anyone in the court clerk's office had access to the system. Arnold testified anytime she would change information in any case she would make a notation in Kellpro explaining what she did and why. Again, there were no notes in the system about any information changing. One month later, Arnold resigned her position in the Okmulgee County Court Clerk's office to take another position outside of Okmulgee County.

**D. <u>Plaintiff's Arrest</u>**

On Saturday, January 19, 2013, eight months after the 2012 warrant was issued, Defendant Aaron Hacker, who is a police officer for the City of Beggs, was performing some sort of research on www.odcr.com. Within the website, Hacker happened upon Case No. CF-1995-0052 which showed "State v. Justin Lee Jones," Plaintiff's name. Beside Plaintiff's name, the website "flagged" the case with "OSW," which stands for "outstanding warrant." Hacker does not dispute that the docket entries within the case on www.odcr.com showed the 2009 warrant as well as the one filed in 2012 which stated "Bench Warrant New Amount Owed." However, one must have a subscription to www.odcr.com to view the <u>actual</u> document filed as oppose to a general docket entry. Neither Hacker nor the Beggs Police Department had a subscription; therefore, he was unable to view the actual warrants on www.odcr.com to notice the discrepancies between the two. According to Hacker, he called Beggs dispatch to confirm

the validity of "the warrant" in CF-1995-0052. Beggs dispatch called Okmulgee County Dispatch, a non party, which confirmed the validity of "the warrant" for Justin Lee Jones. Okmulgee County Dispatch faxed a Warrant Hold to the Beggs Police Department bearing Plaintiff's name, mailing address, and date of birth. In other words, and again for unknown reasons, the Warrant Hold contained the information in the 2009 warrant, not the subsequent warrant of 2012.

Officer Hacker and Defendant Reserve Officer James Zeigler went to Plaintiff's house shortly before 11:00 a.m. the same day. They approached Plaintiff who was standing in his front yard, and Hacker asked Plaintiff what his name was. Plaintiff gave his name, and Hacker responded that they had a warrant for his arrest. Plaintiff told the officers there had been a mistake, and that a misidentification had occurred previously (referring to the Notice of Warrant sent by Arnold in 2009). Plaintiff requested the officers allow him to call his wife, who was not at home, so she could locate documents proving the misidentification. Hacker agreed to Plaintiff's request. Upon her return to the house, Mrs. Jones went into the house and came back out with the Notice of Bench Warrant sent by Arnold in 2009. The Notice, of course, had Plaintiff's information, so it was unhelpful to show misidentification. Hacker also called Beggs Dispatch to request additional identifiers including a photograph of the individual named in the warrant and confirmation of the social security number associated with the warrant. Beggs Dispatch again called Okmulgee County Dispatch to verify the warrant again and requested a photograph. Okmulgee County dispatch provided Plaintiff's drivers' license number and indicated they did not have access to a photograph or the actual warrant. Hacker advised Plaintiff that everything was lining up, and he had to arrest him. Plaintiff was arrested and transported to the Okmulgee County Jail.

Upon arrival at the jail, Plaintiff stayed in civilian clothing and sat on a bench in the booking area for about an hour until his wife paid the bond money owed in CF-1995-0052. Plaintiff agrees he had no personal problems with Arnold or Beaver. To his knowledge, he had never met or spoken to Arnold, and he had only passing encounters with Beaver by virtue of her position as the Court Clerk. Plaintiff agreed he could discern no reason why either would be out to get Plaintiff, nor did they have any motive to have him wrongfully arrested. Plaintiff further has no reason to suspect Judge Pickering, who signed the 2009 warrant, was out to get him in anyway. There is no evidence Arnold had ever issued an erroneous warrant before or after. Indeed, there is no evidence a similar mishap had occurred before or after at all within the Okmulgee County Court Clerk's office.

Plaintiff filed his claim against the Defendants on September 27, 2013. He alleges Arnold violated his Fourth and Fourteenth Amendment rights by issuing the erroneous 2009 warrant.[1] Plaintiff also alleged a constitutional claim of Negligent Hiring, Training, and Retention against Beaver in her individual and official capacities, purportedly in violation of his Fourth and Fourteenth Amendment rights. The Defendants filed their Motions for Summary Judgment.

## II.  Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in light most favorable to the non-

---

[1] Plaintiff also alleged "negligent or intentional infliction of emotional distress" against Arnold. However, he conceded that claim in Response to Arnold's Motion for Summary Judgment.

moving party. *Simms v. Oklahoma,* 165 F.3d 1321, 1326 (10th Cir. 1999). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts…Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citing *Matushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587 (1986)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (Court's italics) (Internal citations omitted).

### III. Plaintiff's Claims Against Jennifer Arnold

### A. Absolute Immunity

Arnold argues she is entitled to absolute immunity in light of her performing a judicial function of issuing arrest warrants. The Supreme Court has recognized the defense of absolute immunity from civil rights suits in several contexts involving the judicial process. *Snell v. Tunnell,* 920 F.2d 673, 686 (10th Cir. 1990). "A judge acting in his judicial capacity is absolutely immune from such suits, unless the judge acts clearly without any colorable claim of jurisdiction." *Id.* (citing *Stump v. Sparkman,* 435 U.S. 349, 356-57 (1978)). "The rationale for according absolute immunity in the civil rights context is to incorporate traditional common law immunities and to allow functionaries in the judicial system latitude to perform their tasks absent the threat of retaliatory §1983 litigation." *Id.* at 686-87. The Court recognizes that absolute immunity has its costs because those with valid claims against dishonest or malicious government officials are denied relief. *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976).

The touchstone of the applicability of the doctrine of absolute immunity is the performance of a function "resolving disputes between parties, or of authoritatively adjudicating private rights." *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 435-36 (1993). Of importance in this case, "when a court clerk assists a court or a judge in the discharge of judicial functions, the clerk is considered the functional equivalent of the judge and enjoys derivative immunity." Immunity is "defined by the functions it protects and serves, not by the person to whom it attaches." *Whitesel v. Sengenberger,* 222 F.3d 861, 867 (10th Cir. 2000). Therefore, it extends to a person other than the judge where performance of judicial acts or activity as an official aid of the judge is involved so long as the non-judicial officer's duties "had an integral relationship with the judicial process." *Whitesel* at 867. This is true whether the action taken was done in error, maliciously, or in excess of authority. *Stump* at 939. *Whitesel* further recognized non-judicial officers are entitled to absolute immunity even when the officer is not performing a discretionary act but a ministerial one at the direction of a judge. *Whitesel* at 867. Enforcing or executing a court order is intrinsically associated with a judicial proceeding. *Bush v. Rauch,* 38 F.3d 842, 847 (6th Cir. 1994).

Absolute immunity has been specifically extended to court clerks by the Tenth Circuit. *See Newton v. Buckley,* 127 F.3d 1109 (10th Cir. 1997) (unpublished) (holding court clerk who issued arrest warrant, with authority, was entitled to absolute immunity despite her not following proper procedure concerning the contents of the warrant and her use of judge's signature stamp.) *Coleman v. Farnsworth,* 90 Fed. Appx. 313 (10th Cir. 2004) (unpublished) (holding court clerk was entitled to absolute immunity in her refusal to issue civil summons because she must have unfettered discretion to review a complaint, determine the requisite filing requirements, and determine whether summons should be issued regardless of procedural error, motive, or good

faith.) *Valdez v. City and County of Denver,* 878 F.2d 1285 (10th Cir. 1989) (holding absolute immunity for official assigned to carry out a judge's orders is necessary to ensure that such officials can perform their function without need to secure permanent legal counsel, and that a lesser degree of immunity could impair the judicial process.).

Plaintiff argues the above-cited precedential cases are inapposite because, according to him, Arnold was not performing a task delegated by a judge when she issued either the 2009 warrant or the 2012 warrant. He argues that Arnold was not ordered or directed to issue those particular warrants. In other words, no judge of Okmulgee County directed her to issue an arrest warrant for CF-1995-0052 *specifically.* Plaintiff also argues there was no written, local court rule stating that the court clerk is in charge of issuing failure-to-pay warrants, nor is there any statute directly on point providing Arnold with authority to issue warrants. Essentially, Plaintiff alleges Arnold was a "loose cannon" who was making the rules up as she went along.

However, the evidence and a healthy dose of common sense clearly show otherwise. First, Arnold provided an affidavit from Judge Cynthia Pickering, the judge who signed the erroneous 2009 warrant in question, in which she averred Arnold was doing exactly as was expected of her despite the fact that CF-1995-0052 was not specifically brought up in a topic of conversation. Judge Pickering also testified through affidavit that hundreds of failure-to-pay arrest warrants are signed per month by the Okmulgee County judges upon presentation by the Cost Administrator. It is not surprising, then, that there was no specific conversation among Arnold and Judge Pickering about CF-1995-0052 in particular because the judges expected Arnold to submit warrants to them for <u>any and all</u> defendants who had not paid the fines the judges themselves had imposed. The failure-to-pay warrant procedure in Okmulgee County has seemingly been the same for years. Plaintiff points to no evidence, nor does he make any

argument, showing why the judges would sign the warrants at all if deputy court clerks such as Arnold were issuing warrants without authority to do so. Logically, the judges would not sign the warrants if they were simply presented out of the blue. Accordingly, the Court finds Arnold was clearly acting as she was authorized to act by the Okmulgee County judges when she would print, sign, and present arrest warrants for the judge's signature upon the determination the criminal defendant had not paid the fines imposed.

Second, Plaintiff's citation of *Petuskey v. Cannon,* 742 P.2d 1117 (Okla. 1987) is more helpful to Arnold than it is Plaintiff. In *Petuskey,* the Oklahoma Supreme Court was asked to address the extent and scope of the administrative authority of District Court judges over the elected Court Clerk and his or her deputies. The *Petuskey* Court recognized that Art. VII of the Oklahoma Constitution provides for a unified system of judicial management. The Court noted that the state's constitution and statutory scheme make clear that its "judiciary has exclusive authority to manage its own affairs." *Id.* at 1120. The Court recognized that the court clerks are officers and arms of the court, and that the clerk is "ultimately connected to the existence, dignity, and function of the judiciary." *Id.* at 1121. The Oklahoma Supreme Court further recognized that once fines, fees or costs are ripe of collection, such as in the case of CF-1995-0052, "the clerk should not be discouraged from collecting the overdue moneys." *Id.* at 1122. Moreover, Oklahoma's Attorney General issued an opinion noting that Oklahoma's statutory scheme clearly provides authority for the court clerk to issue arrest warrants. 1982 OK AG 17. Thus, not only does Oklahoma's statutory scheme allow for clerks to issue arrest warrants, clerks clearly have an "integral relationship with the judicial process," and are therefore entitled to absolute immunity regardless whether they make an error or even act maliciously in carrying out their duties.

Third, the Court finds that few judicial acts "authoritatively adjudicate[e] private rights," as held by *Antoine,* more than ordering the arrest of an individual. Further, as pointed out by the Defendant, had Judge Pickering printed, signed, and issued the warrant herself, as oppose to relying on Arnold, the result would have been the same because the information was wrong in the Kellpro system. And, there would be no question Judge Pickering would be entitled to absolute immunity. The fact that Judge Pickering did rely on Arnold makes Arnold the "functional equivalent of the judge," and thus Arnold is similarly entitled to absolute immunity.

**B.  Plaintiff's Fourth Amendment Claim and Arnold's Qualified Immunity**

Arnold argues she is entitled to summary judgment on Plaintiff's Fourth Amendment claim because the Fourth Amendment is inapplicable with respect to her actions. Plaintiff spends a majority of his Response arguing whether there was probable cause for his arrest. Plaintiff argues there was no probable cause for his arrest, and therefore Arnold *de facto* violated his Fourth Amendment right against unreasonable seizures. Plaintiff correctly points out that an erroneously issued warrant cannot provide probable cause for an arrest. *Whiteley v. Warden,* 401 U.S. 560 (1971).

However, whether there was probable cause for the arrest of Plaintiff is only part of the inquiry. A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom. *See Brower v. County of Inyo,* 489 U.S. 593 (1989). A seizure occurs even when an unintended person is the object of detention, so long as the means of detention are intentionally applied to that person. *Id.* (citing *Hill v. California,* 401 U.S. 797 (1971)). Similar factual circumstances took place in *Berg v. County of Allegheny,* 219 F.3d 261 (3rd Cir. 2000). In *Berg,* a court clerk was asked to prepare a bench warrant for one Paul Banks. The court clerk generated the warrant using the County's computerized Integrated

Court Information System which was operated by typing in a criminal complaint number into the computer. The computer then automatically retrieves the remaining information, including the identifying information of the defendant. *Id.* at 266. While generating the warrant, the court clerk transposed two digits of the criminal complaint number. This resulted in a warrant being issued for the plaintiff, Raymond Berg, instead of the intended criminal defendant. Berg was eventually arrested, and he subsequently sued the court clerk, among other individuals. The Third Circuit held there was no evidence the court clerk intentionally caused the plaintiff to be arrested. *Id.* at 274. Like this case, the plaintiff conceded the court clerk did not notice the error when she issued the warrant. *Id.* Accordingly, the court clerk did not cause the plaintiff to be arrested through means intentionally applied to plaintiff.

Plaintiff herein must point to some evidence Arnold intentionally caused his arrest for the Fourth Amendment to be applicable to her actions, and Plaintiff has failed to do so. Arnold intended to issue a warrant for the criminal defendant of CF-1995-0052, or Justin <u>Riley</u> Jones. Because the information was inaccurate in the Kellpro system, the warrant she printed contained Plaintiff's name and other identifiers. Plaintiff does not dispute that Arnold was not aware or failed to notice Plaintiff was not the criminal defendant subject to CF-1995-0052. Thus, Plaintiff's Fourth Amendment claim against Arnold fails as a matter of law.[2]

Even if the Court were to find the Fourth Amendment applicable, and Arnold violated Plaintiff's Fourth Amendment rights, she would be entitled to qualified immunity. Qualified immunity is more than a defense to liability: it is an immunity from suit that is effectively lost if a case is erroneously permitted to go to trial. *Schwartz v. Booker,* 702 F.3d 573, 579 (10th Cir.

---

[2] The Court notes Plaintiff conceded his intentional infliction of emotional distress claim in Response to summary judgment. This reaffirms that Plaintiff has no evidence Arnold intentionally set out to have him arrested.

2012). An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established." *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014). "[E]xisting precedent must have placed a statutory or constitutional question beyond debate" and the Supreme Court "has repeatedly told courts…not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* Moreover, it is Plaintiff's obligation to show that the Defendant's actions violated a specific statutory or constitutional right, and that the right was clearly established at the time of the conduct in question. *Toevs v. Reid,* 646 F.3d 752, 755 (10th Cir. 2011).

As noted, Plaintiff argued exhaustively that there was no probable cause for his arrest. However, Plaintiff has not cited any binding precedent, or any case, establishing that an accidental computer mishap by a court clerk is a clear violation of his Fourth Amendment rights. Indeed, the only case Plaintiff cites with any factual similarities is *Berg.* However, the *Berg* Court found in favor of the court clerk on the *Berg* plaintiff's claims. Moreover, *Berg* is not from the Tenth Circuit or the United States Supreme Court, nor does it appear to have ever been cited by either. Therefore, even if the *Berg* decision were in Plaintiff's favor (it is not), it would not count as "clearly established law" for purposes of whether Defendant Arnold is entitled to qualified immunity. Accordingly, she is entitled to qualified immunity.

## C. Plaintiff's Fourteenth Amendment Claim and Qualified Immunity

The Court notes there is very little case law regarding the standard to be applied to a court clerk who erroneously issues an arrest warrant. For purposes of this Opinion, the Court will assume the standard is that of "deliberate indifference." Deliberate indifference requires a state actor to be subjectively aware of and deliberately ignore a substantial risk of a

constitutional injury. See generally *Dodds v. Richardson,* 614 F.3d 1185 (10th Cir. 2010). Negligence, and even gross negligence, is not enough to support a claim of deliberate indifference. *Berry v. City of Muskogee, Oklahoma,* 900 F.2d 1489, 1495 (10th Cir. 1990). Thus, Plaintiff must show Arnold was subjectively aware of and deliberately ignored a substantial risk Plaintiff would be wrongfully arrested.

Plaintiff relies substantially on his wife's phone call to the court clerk's office in 2009 after Plaintiff received the Notice of Warrant from Arnold. However, there is no evidence Tammy Jones ever spoke to Jennifer Arnold, even if she spoke to someone within the office, and it is Arnold's subjective knowledge in question. The evidence in the record establishes that 1) anyone in the court clerk's office could have answered the phone; 2) Tammy Jones does not know who she spoke with; 3) Tammy Jones did not specifically ask for Arnold; 4) Arnold denies ever having such a conversation; and 5) Plaintiff could not dispute with evidence Arnold's testimony that she habitually put notes in the Kellpro system if she had a conversation with a person about any given case. No such notes exist. Thus, there is no reasonable inference within the evidentiary record Arnold was subjectively aware of the erroneous warrant in 2009.

Somehow, some information was changed in Kellpro which deleted Plaintiff's address and changed the date of birth to the correct date of birth. Arnold concedes should could have made the changes, but she has no recollection of doing it and anyone in the office could have changed the information. Regardless, the fact remains that the information was changed to include identifying information other than Plaintiff's. A new warrant was issued in 2012 and faxed to the Sheriff's Department. It was also available for public inspection, including www.odcr.com. It is not clear why the information from the 2009 warrant, as oppose to the 2012 warrant, was relayed to Hacker the day of the arrest. Regardless, the record does not establish

Arnold was indifferent to the erroneous warrant, even we assume Arnold ever knew at some point that the 2009 warrant was incorrect. At best, Arnold was negligent which is not enough for a constitutional claim to survive scrutiny.

Lastly, as indicated above, there is no Tenth Circuit or Supreme Court case law which clearly establishes that accidently issuing an erroneous warrant is a violation of the 14th Amendment. Plaintiff again relies solely on the *Berg* case from the Third Circuit which does not establish a "clearly established" right in the Tenth Circuit. Arnold is entitled to qualified immunity.

## IV. Plaintiff's Claims Against Linda Beaver In Her Individual Capacity

Plaintiff alleges only one claim against Linda Beaver in her individual capacity. [Dkt. No. 2]. He alleges Beaver had constitutionally deficient hiring, training, and retention practices as it relates to Defendant Arnold, and that she was deliberately indifferent in that regard. Beaver filed her Motion for Summary Judgment arguing she is entitled to absolute immunity, entitled to qualified immunity (alternatively), she had no personal involvement in issuing the warrants in question, and that Plaintiff has failed to show a constitutional claim for Beaver's hiring and/or training Arnold.

## A. Beaver's Personal Involvement

At the outset, Under § 1983, Beaver cannot be vicariously liable for the alleged actions of individuals under her employ. "[T]here is no concept of strict supervisor liability under § 1983." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). To have any potential liability under § 1983, Beaver must have personally participated in or personally directed the erroneous warrant be issued. In *Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987), the appellate court stated: "Each individual defendant can be liable only for what he or she did personally, **not for**

**any recklessness on the part of any other defendants, singly or as a group**." (emphasis added).

*Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146 (10th Cir. 2006) is instructive. The Tenth Circuit affirmed that "[t]o establish supervisor liability under § 1983, 'it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation. Instead, ... the plaintiff must establish **'a deliberate, intentional act by the supervisor to violate constitutional rights**.'" 455 F.3d at 1151 (emphasis added) [citing *Jenkins v. Wood*, 81 F.3d 988, 994 – 95 (10th Cir.1996); and *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir.1992)]. The Tenth Circuit also stated that "supervisory liability 'must be based upon active unconstitutional behavior' and 'more than a mere right to control employees.'" 455 F.3d at 1153, citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

In *Porro v. Barnes*, 624 F.3d 1322 (10th Cir. 2010), the plaintiff argued that the defendant Sheriff should be liable "by virtue of the fact that he was [the detention officer's] supervisor." *Id*., at 1327. The Tenth Circuit firmly rejected this argument. "To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act" on the part of the defendant "to violate [the plaintiff's legal] rights." . . . . **Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else**. *Id*., at pp. 1327 – 1328. In addition to the previously cited authorities, other courts have affirmed that supervisory liability "requires something more than mere presence at the scene where subordinates allegedly violated the plaintiff's constitutional rights. The plaintiff must demonstrate an officer's 'overt personal participation' in the violation of his own rights, not someone else's." *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008); citing *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). See also *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253

(10th Cir. 2007)(mere presence at the scene is not enough to establish liability).

Plaintiff has submitted no evidence Beaver personally had any hand in issuing any warrants, let alone the warrant in question here. Plaintiff testified Beaver is being sued because she was the "top dog" in the Court Clerk's office. This is clearly not enough to hold her personally liable under vast case law. Moreover, Plaintiff's Response to Defendant Beaver's Motion for Summary Judgment is also telling. A majority of Plaintiff's brief and purported factual disputes detail what was allegedly done in "Linda Beaver's office." Sections III and IV of his Response, which argue his Fourth and Fourteenth Amendment rights were violated, are dedicated nearly entirely to what Arnold allegedly did or did not do. Plaintiff points to no evidence of what Beaver, individually, did or did not do. Thus, it is clear Linda Beaver had no individual involvement with the issuance of the warrants, and she is entitled to summary judgment.

## B. **Beaver's Alleged Unconstitutional Policy For Issuing Warrants and Qualified Immunity**

As noted, Plaintiff's sole allegation in his Complaint against Linda Beaver individually was in regard to her hiring, training, and retention of Arnold. In Response to Beaver's Motion for Summary Judgment, Plaintiff says little, if anything, about any inadequacies in Beaver's training program or why Arnold should not have been hired in the first place. Instead, Plaintiff complains about the alleged "policy" of the Court Clerk's office for failing to have "fail safes" or "double checks" to ensure a warrant is not mistakenly issued by a deputy clerk such as Arnold.

In support of her allegation against Beaver individually, Plaintiff relies exclusively on *Berg.* In *Berg,* the plaintiff contended the <u>County</u> was liable because of its failure to provide sufficient procedural or technical safeguards against errors such as the one that resulted in the plaintiff's arrest. *Berg* at 276. The court noted that the record contained no evidence of

procedures guarding against the clerk's mistake. Thus, the *Berg* court held that "[h]aving employed a design where the slip of a finger could result in wrongful arrest and imprisonment, there remains an issue o fact whether the County was deliberately indifferent to an obvious risk." *Id.* at 277 (underlining added).

First, and perhaps most importantly to Beaver's individual liability, the *Berg* court's analysis was specifically directed toward the County, not the individual in charge of the office in question. In fact, the court noted that "Demko and Gardner intended to arrest Banks [the correct defendant]. But the County intended that the individuals identified by the warrant-issuing system be arrested. In this case, the person was Berg. Thus the County intentionally seized Berg through means intentionally applied." *Id.* at 277, n. 7. The court carefully distinguished individual liability from municipal and, in fact, held that the head of the office (Gardner) could not be personally liable. Plaintiff herein is treating Beaver, who has an individual and official capacity, as one which is inappropriate in the constitutional context.

Second, there is no evidence that a similar mistake had ever occurred before. There is no evidence employees of the court clerk's office were regularly sending out bad warrants, and certainly no evidence Beaver had knowledge of any bad warrants. The system in question had been in place for several years, and the only evidence in the record is one erroneous warrant out of thousands. Plaintiff has offered no evidence that other court clerks from around the state had implemented "double checks" on the state-mandated Kellpro system, or that Linda Beaver refused to implement such "fail safes." Moreover, the Kellpro system was not designed by Beaver individually. She merely used the system as directed by the state, and Plaintiff provides no specific insight as to how Beaver was to change this relatively complex computer program. In sum, the record is devoid of evidence from which a reasonable juror could infer that Linda

Beaver, individually, was subjectively aware of and deliberately ignored a substantial risk of a constitutional injury.

Lastly, Plaintiff failed to show any established precedent that Linda Beaver violated his constitutional rights for purposes of qualified immunity. He relies solely on *Berg,* an out-of-circuit case never before cited by the Tenth Circuit or the Supreme Court. And, *Berg* found in favor of the individual defendants, including the defendant in a similar position as Beaver. Accordingly, Beaver is entitled to qualified immunity.

## C. <u>Absolute Immunity</u>

Linda Beaver also claims absolute immunity for the issuance of arrest warrants. Plaintiff's Response in opposition to the claim of absolute immunity is that Beaver "is attempting to assert an immunity defense for actions taken by Defendant Arnold." By the same token, Plaintiff has argued Beaver is individually liable for his arrest "for actions taken by Defendant Arnold." Thus, Plaintiff's arguments are self-defeating. Assuming Beaver was directly involved enough in the warrant process to find a causal link between her individual actions and Plaintiff's arrest, Beaver would be entitled to absolute immunity for the same reasons Arnold is entitled to absolute immunity: she is the "functional equivalent of the judge." If Beaver is not directly involved enough in the warrant process to find a causal link between her individual actions and Plaintiff's arrest, then no constitutional claim will lie anyway. Thus, regardless of which avenue Plaintiff wishes to take in his argument, Linda Beaver is entitled to summary judgment.

IT IS SO ORDERED this 20th day of March, 2015.

James H. Payne
United States District Judge
Eastern District of Oklahoma